ROSSLYN CONCRETE CONSTRUCTION COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–1426.

United States Court of Appeals, Fourth Circuit.

Argued April 14, 1983.

Decided July 28, 1983.

Robert G. Ames, Robert A. Rapp, Baltimore, Md. (Venable, Baetjer & Howard, Baltimore, Md., on brief), for petitioner.

Christine Weiner, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D.C., on brief), for respondent.

Before WINTER, Chief Judge, and RUSSELL and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

The Rosslyn Concrete Construction Company ("the Company") has petitioned this court to set aside an order of the National Labor Relations Board finding the Company in violation of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), and directing the Company to bargain with the Washington Building and Construction Trades Council, AFL–CIO ("the Union"). The Board has cross-petitioned for enforcement of its order. We now grant enforcement.

## I.

In February, 1980, the Union petitioned the Board for certification as exclusive bargaining representative of the Company's construction workers. The Union and the Company subsequently reached a stipulation on the certification election which described the employees in the appropriate bargaining unit as

> All employees employed by the [Company] performing construction work in the Washington, D.C. Metropolitan Area excluding all office clerical employees, professional employees, guards and supervisors as defined in the Act.

The election was held under Board supervision on April 11, 1980. Out of 151 ballots cast, 66 were for the Union, 68 against it, and 17 were challenged and subsequently investigated by the Board's Regional Director.

Two sets of challenges to the election are still at issue. First, the NLRB election supervisor challenged thirteen ballots because the persons who cast them were not on the eligibility list supplied by the Company. Three of these persons were convicted felons who were at the time in the custody of the Department of Corrections of the District of Columbia, and were employed by the Company pursuant to that department's work release and training programs. In addition, the Union challenged the ballots of three individuals employed as "timekeepers." These timekeepers work almost exclusively on construction sites. About half of their time is spent collecting payroll and cost analysis information for the main office by observation and consultation with construction workers. The rest of their time is spent preparing the information gathered, carrying out general duties at the sites' trailer-offices, and running errands for project superintendents. Unlike construction workers, timekeepers are paid a salary rather than hourly wages, and have a fringe benefit package. Like employees receiving hourly wages, timekeepers are eligible for overtime. At the evidentiary hearing, the Company's president conceded that the timekeepers are primarily answerable

to the main office and not to their nominal superior, the project superintendent, and that other than their peculiar duties, "there are very few things a timekeeper can do on a job site." In response to a question by the Company's attorney, the Company's president speculated that "it is possible that in a tight situation" the timekeepers might have to do some actual construction work. There was no evidence that this had ever occurred.

After the hearing on the unresolved challenges, the Board's hearing officer concluded that the challenge to the employees not on the eligibility list, specifically including the three inmate-employees on work release, was invalid, and that the Union challenge to the timekeepers was correct because the timekeepers were not within the appropriate and stipulated bargaining unit. On July 15, 1981, the Board adopted the hearing officer's recommendations, and ordered a recount of the ballots, with the following result: 73 for the Union, 71 against, and 7 challenged ballots not counted. On July 30, the Board certified the Union.

The Company, however, refused to bargain with the Union,[1] which therefore filed an unfair labor practice complaint with the Board. General Counsel for the Board issued a complaint to which the Company responded with the argument that the certification of the Union had been improper. On May 7, 1982, the Board granted the General Counsel's motion for summary judgment.

## II.

█ The first set of challenges now before us involves the ballots of the three inmate-employees. These ballots were originally questioned by the Board's election representative because the men were not on the Company's list of eligible employees. Their absence from the list was due to the fact that they and others had been laid off before the voter eligibility date and had returned to work after that date. Subsequent to that challenge, the Company challenged the three inmates' ballots specifically on the ground that as prison inmates they did not share a community of interest with other employees. Before this court, the Company also seeks to raise other issues, claiming that it is not their "employer" within the meaning of the statute, that they are not "employees" under the statute, and that certification of a bargaining unit including prisoners is against public policy. Because these contentions were not presented to the Board, we are without jurisdiction to hear them. *See Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398, 414–15, (1982). The only issue to be decided with regard to the inmates, therefore, is whether the Board properly included them within the bargaining unit despite their supposed lack of a community of interest with the other construction workers.

█ In the proceedings below, the Company stipulated that under the usual standards, *see Methodist Home v. NLRB,* 596 F.2d 1173 (4th Cir.1979), the inmates share a community of interest with other, eligible Company employees: they work side-by-side with other employees, receive commensurate wages, and share identical working conditions. Two of the three men were at the time in halfway houses rather than prison proper and were virtually unrestricted in their ability to work overtime. The third man had to take a 10 p.m. bus back to the prison unless the Company notified the prison and provided alternate transportation.

The Company's attempt on appeal to circumvent its earlier stipulation is predicated on the notion that the restrictions on the inmates imposed by the prison work release program undermine their ostensible community of interest with other employees. However, as the Board points out, most of the program's rules either concern offwork activities of the inmates or generally re-

---

1. This was, of course, the Company's proper path to judicial review of the Board's election decision. *See Magnesium Casting Co. v.* *NLRB,* 401 U.S. 137, 139, 91 S.Ct. 599, 600, 27 L.Ed.2d 735 (1971).

quire them to behave responsibly. Two rules prohibit participation in strikes, strike-breaking, or demonstrations, but permit participation in other concerted union activity.

The Company counters that the prison officials' power to monitor inmate-employees and to terminate their employment sets the latter apart from normal employees. However, the Board found that these powers do not "interfere with the [Company's] operation or affect the employee during the day." Since "[t]he test as to whether an employee shares a community of interest with his fellows ... depends on his status while in the employment relationship and not what ultimate control he may be subjected to at other times," *Winsett-Simmonds Engineers, Inc.,* 164 NLRB 611, 612 (1967), the NLRB concluded that the inmate-employees were properly included in the bargaining unit. These findings and conclusions are based on substantial evidence and on the Board's consistent precedents, *see also Georgia-Pacific Corp.,* 201 NLRB 760 (1973), and must be upheld.

## III.

The second set of ballot challenges still in contention involve the ballots of the three timekeepers which the NLRB ruled out on the recount. Relying on the established rule that " 'where the parties stipulate that the appropriate unit will include [or exclude] given jobs, the Board may not alter the unit; its function is limited to construing the agreement according to contract principles, and its discretion to fix the appropriate bargaining unit is gone,' " *Methodist Home,* 596 F.2d at 1176 (citation omitted) (brackets in original), the Company contends that the NLRB improperly applied its community of interest test to exclude the timekeepers in disregard of the stipulation on the bargaining unit's scope. The Company argues first that the stipulation's plain language, that the bargaining unit should include "[a]ll employees ... performing construction work," clearly includes the timekeepers, whose tasks are directly related to the Company's construc-

tion and who spend virtually all of their work-time at Company construction sites. The Company next contends that the stipulation's express *exclusion* of "office clerical workers, professional employees, guards and supervisors" implies the *inclusion* of the timekeepers by virtue of the maxim *expressio unius est exclusio alterius.*

In the alternative, the Company argues that a proper application of the community of interest test dictates inclusion of the timekeepers, who share similar "wages," hours and working conditions with the undisputed construction workers; who occasionally perform undeniable construction tasks; and who are functionally integrated into the construction site crews. The Company also cites *J. Ray McDermott and Co.,* 240 NLRB 864 (1979), in which the NLRB held that a construction company's timekeepers were "plant clericals" properly included in a bargaining unit.

The Company's arguments, plausible on their face, collapse under scrutiny. We cannot accept the Company's claim that the stipulation's plain language mandates inclusion of the timekeepers in the bargaining unit. The stipulation refers to employees "performing construction work," something which, by the Company's president's own admission, the timekeepers do not do. Nor does the invocation of Latin doggerel aid the Company: the Board's argument is persuasive that the timekeepers, whose work centers on and takes place primarily within the construction site trailer-offices, and which is an adjunct of the operations of the Company's main headquarters, are "office clerical workers" specifically excluded from the bargaining unit.

The Company does no better by conceding ambiguity in the stipulation and applying the community of interest test. That test as described by this court " 'consists of examining and comparing a number of factors (*e.g.,* similarity of work performed, similarity of scale of earnings and other benefits, similarity of qualifications and skills, etc.) ....' " *Methodist Home,* 596 F.2d at 1176 n. 1 (citation omitted). Application of this test supports the Board's posi-

tion. Although the Company suggests otherwise, it is clear that the timekeepers do not receive the same "wages" or "benefits" as *bona fide* construction workers. Unlike the latter, the timekeepers are on salary and receive a fringe benefit package similar to that provided professional employees. The testimony of the Company's president showed that the timekeepers' duties, both official and in practice, were almost totally dissimilar to the jobs of construction workers. Timekeepers, unlike the carpenters, masons, and other craft practitioners who were included in the bargaining unit, do not practice a recognized skilled trade.

Finally, the Company misconstrues its supposed authority, the *McDermott* case. Although the employer in that case was primarily engaged in construction, the corporate division actually involved in the labor dispute was a manufacturing facility making pipe and other products. Therefore the Board correctly applied the principles used in manufacturing industry unit cases, not those used in construction industry cases. In construction industry situations, such as here, but not in *McDermott,* the Board pays great heed to the traditionally recognized building trades as evidence of the proper limits of a bargaining unit. *See, e.g., R.B. Butler, Inc.,* 160 NLRB 1595 (1966). The appropriate unit may consist of a single craft, or, as here, of all employees engaged in construction activities proper. *See New Enterprise Stone & Lime Co.,* 172 NLRB 2157 (1968). By contrast, in manufacturing situations, plantwide bargaining units are accepted which cross trade or skill lines or which encompass workers who are not employed directly in manufacturing activities. *See, e.g., Century Electric Co.,* 146 NLRB 232 (1964). We therefore conclude that the Board's finding that the timekeepers should not be included in the bargaining unit is supported by substantial evidence and comports with existing law.

## IV.

The Company's petition to set aside the Board's order is denied. The Board's cross-petition for enforcement is granted.

ENFORCEMENT GRANTED.